Thomas CONWAY, Plaintiff–Appellee–
Cross–Appellant,

v.

ICAHN & CO., INC., Defendant–
Appellant–Cross–Appellee.

Nos. 313, 547, Dockets 93–7282, 93–7342.

United States Court of Appeals,
Second Circuit.

Argued Oct. 4, 1993.

Decided Feb. 15, 1994.

Matthew Farley (Charles D. Donohue, Maureen J. Cunningham, Mark C. Catana, Shanley & Fisher, P.C., New York, NY, of counsel) for Defendant–Appellant–Cross–Appellee.

Jack Minoff, Esq., New York, NY (George J. Castrataro, Esq., New York, NY, of counsel) for Plaintiff–Appellee–Cross–Appellant.

Henry F. Minnerop (Joseph McLaughlin, Stephen T. Paine, Brown & Wood, New York, NY, of counsel) for Amicus Securities Industry Association.

Before: MINER and ALTIMARI, Circuit Judges, ELFVIN, District Judge.*

MINER, Circuit Judge:

Defendant-appellant-cross-appellee Icahn & Co., Inc. ("Icahn") appeals from a money judgment in favor of plaintiff-appellee-cross-appellant Thomas Conway in the sum of $357,240 with interest, entered in the United States District Court for the Southern District of New York (Ward, *J.*) following a jury trial. Conway maintained an account with Icahn, a stock broker, and his claim arises from the liquidation of a portion of that account to satisfy a margin call. The jury specifically found that Icahn breached its fiduciary duty to Conway and was negligent in liquidating the account. On appeal, Icahn argues that Conway waived any claim of negligence or breach of fiduciary trust by executing a Customer Agreement that permitted liquidation without notice to meet margin requirements. The Agreement was executed by Conway and Cowen & Co. ("Cowen"), the clearing broker that ordered Icahn to undertake the partial liquidation of Conway's account. Icahn also argues that

---

* Hon. John T. Elfvin, Senior United States District Judge for the Western District of New York, sitting by designation.

Conway's losses were not proximately caused by its negligence or breach of fiduciary duty and that the district court improperly restricted the introduction of certain medical records.

In his cross-appeal, Conway contends that the district court erred in concluding that the jury's assessment of damages in the sum of $357,240 on each of the claims on which it returned a verdict was duplicative. Conway also contends that the district court erred in directing that interest be computed from the date the action was commenced rather than from a more appropriate earlier date.

Finding no merit in any of the arguments advanced on either the appeal or the cross-appeal, we affirm the judgment of the district court in all respects.

## BACKGROUND

Conway came to the United States from Ireland in 1950 with less than $200. After working as a laborer, he acquired a license that enabled him to work as a maintenance engineer. Now 67 years of age, he has been employed as a night maintenance engineer at Macy's for the past 25 years. Conway also is a very sophisticated and knowledgeable investor in the stock market. He is a self-taught expert in the identification of undervalued securities and has bought and sold stock for some 20 years.

By October 16, 1987, the date of the steepest one-day drop in the stock market to that date, Conway held securities valued at $12,-580,000 in his securities account with Icahn. His equity in the account was approximately 49% of its value at that time. Conway had opened the account with Icahn in March of 1981 as a non-discretionary margin account. He understood that Cowen, as clearing broker, was in charge of administering the margin aspects of his account with Icahn. *See generally* Henry F. Minnerop, *The Role and Regulation of Clearing Brokers,* 48 Bus.Law. 841 (1993); Ronald T. Carmen & William J. Fitzpatrick, *An Analysis of the Business and Legal Relationship Between Introducing and Carrying Brokers,* 40 Bus.Law. 47 (1984). This understanding was confirmed in a Customer Agreement between Conway and Cowen. The Customer Agreement, executed on March 24, 1981, covered the extension of credit to customers carrying margin accounts. It provided to Cowen a general lien against Conway's account as well as the authority to sell any asset in the account, in any manner and without notice, to satisfy any indebtedness.

The account that Conway opened with Icahn in 1981 actually was a transfer of an existing brokerage account that Conway held with Merrill Lynch. Conway testified that he moved the account because he wanted to have the benefit of the reduced commission rates available at a discount brokerage firm such as Icahn. Although Cowen ordinarily required that a margin account be maintained at 35% equity, i.e., that the value of the equity net of debt could not be less than 35% of the total value of the account, it made an exception in the case of Conway and fixed his margin requirement at 30%. This arrangement was made through Lou Fiore, Manager of the Icahn Retail Discount Department. Conway previously had sought and received reduced house equity maintenance requirements of 30% in his margin accounts at other firms. Under the Customer Agreement, however, Cowen had the right to increase its equity percentage requirement without notice to Conway. If the existing holdings were insufficient to satisfy equity requirements, the increase could be satisfied by depositing additional assets into the account or by selling assets. Both brokers were aware of the fact that Conway never met a margin call by liquidating securities in his account. The few margin calls that were made were settled by cash payments or other arrangements. Mr. Fiore of Icahn also requested and received permission from Cowen to charge Conway a special low interest rate on his margin account borrowings. Clearly, Conway was a preferred customer of both Icahn and Cowen.

Although he was fully aware of the substantial losses he had sustained in the precipitous stock market decline that occurred on October 16, 1987, Conway perceived an investment opportunity in the then-current market situation. Accordingly, on Monday, October 19, 1987, Conway placed more than a

dozen orders by telephone with Barry Ferrari of Icahn. Ferrari had replaced Lou Fiore as Manager of Icahn's Retail Discount Department and accepted the orders after discussing with Conway the "buying power" of the net equity in the Conway account. The orders were "limit" orders and as such were not subject to execution until the market price specified by Conway was reached. These orders were effective only on October 19, and would be cancelled if not executed on that date. As of October 19, Conway also had outstanding "good until cancelled" orders to purchase shares of stock in three companies as well as a sell order for Bank of America preferred stock. The orders placed accounted for over one-and-one-half million dollars of the buying power in Conway's account. On October 19, 1987, "Black Monday" as it became known to investors, the stock market sustained its largest single day decline in its history. Except for Conway's order to sell his Bank of America preferred stock, which was only partially executed, all of Conway's October 19 orders were executed on that date or "as of" that date.

On October 17, Cowen had made a determination to rescind previous exceptions to its house margin requirements and to bring all its margin requirements to 35% equity. It is questionable whether Icahn ever was notified of this change as applied to Conway's account. Conway himself denies he ever was advised of the change. In any event, by the close of trading on October 19, the equity level of Conway's account was 31.31%. By Friday, October 23 or Saturday, October 24, Conway received confirmations for his purchase orders and for the sale of his Bank of America shares. By the close of the market on October 26, the equity in Conway's account with Icahn had fallen to 22.80%, which was below the New York Stock Exchange requirement of 25%. An additional sharp drop in the market that occurred on October 26 was responsible for this further deterioration in Conway's equity.

Conway testified that, during the week following October 19, he regularly attempted to reach Icahn by telephone from his home but that the lines were busy and he never was able to get through to discuss the condition of his account. Mr. Ferrari of Icahn, on the other hand, testified that he tried to call Conway several times during the week but got no answer. Although Conway received some "minor margin calls" by mailgram on October 22 or October 23, he said that he did not understand, in light of what he perceived to be his buying power at the time, "why [Ferrari] was sending out a margin call like that." Attempts to reach Ferrari with regard to these margin calls also failed, according to Conway. It was Ferrari's recollection that he spoke by telephone with Conway "regarding a large maintenance call in Mr. Conway's account," but he was not certain who initiated the call or on what date it took place. He did recall being instructed by Conway to "do what you have to do" to meet the call. He took that statement to mean that Conway was giving him discretion as to what securities should be sold. Conway denies that such a conversation ever took place and testified that he was unaware of the massive sell-out in his account until he received his monthly statement along with "a bunch of confirmations and a bunch of sellout orders on November 7."

The sellout orders resulted from a margin call in excess of $1,700,000 on Conway's account. The call was made on October 26 or October 27. On October 27, Cowen directed Icahn to liquidate securities in the account to meet the call, and Mr. Ferrari prepared tickets and caused the sales to occur on that day and on the following day. The sales produced proceeds of 3.7 million dollars, which ultimately increased the equity in the account to 35.54%. Although a 1.7 million dollar margin call requires new cash in that amount, the sale of securities to meet such a call requires a liquidation of securities in at least twice that amount because the proceeds must be applied to the debit. Evidence was presented to the jury that the selloff was without notice to Conway, who had cash assets of 1 million dollars in an account with Merrill Lynch, and who never before had allowed securities not designated by him to be sold from his account. It seems certain that Mr. Ferrari of Icahn commenced the selloff immediately upon receiving the direction from Cowen.

Conway was hospitalized for alcohol abuse on October 29, 1987 and released on November 4, 1987. When he was admitted to the hospital, Conway's blood alcohol content was .20—twice that required for legal intoxication—and he was treated for "acute alcohol intoxication." Icahn contends on appeal, as it did at trial, that "[p]laintiff's self-induced physical and mental condition following Black Monday rendered him incapable of making any meaningful investment decisions or taking any action to meet the margin calls." Concerned with objections relating to privilege and prejudice, the district court excluded records pertaining to Conway's hospitalizations in September of 1978, December of 1986 and December of 1988. The court was somewhat equivocal regarding records of the October 1987 hospitalization, ruling successively that the records would be reviewed *in camera* and redacted as necessary; that defense counsel's access would be determined during trial; that the records would not be admitted in evidence or utilized by counsel; and that defense counsel could ask certain questions based on limited information supplied by the court from the records. Conway was subjected to limited cross-examination regarding his medical condition and hospitalization. After his testimony was concluded, and on the last day of trial, the court for the first time made available to counsel the entire unredacted admission record for the 1987 hospitalization. Defense counsel then offered into evidence a selected portion of that record, and the court received it.

Conway brought the underlying action to recover the losses that he sustained attendant to the sellout in his account. He asserted nine claims in his complaint—one federal claim for violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)— and eight pendant state law claims. The case ultimately was submitted to the jury on four of the state law claims—breach of contract, conversion, negligence and breach of fiduciary duty. In response to interrogatories, the jury found no breach of contract and no conversion but determined that Icahn was liable for negligence and breach of fiduciary duty. The jury assessed damages in the sum of $687,000 on Conway's negligence claim but reduced the sum to $357,240 on account of contributory negligence of 48%. It also assessed damages of $357,240 on Conway's breach of fiduciary duty claim.

By post-trial motion, Icahn sought judgment as a matter of law, a new trial or, in the alternative, to limit Conway's judgment to $357,240. Finding that the separate jury awards were based on the same breach of duty, the district court granted Icahn's motion for limitation but denied it in all other respects. The district court granted Conway's post-trial cross-motion for prejudgment interest, awarding interest at the rate of 9% per annum from the date the action was commenced to the date of judgment. On appeal, Icahn argues that (1) Conway's express waiver bars any claims for negligence or breach of fiduciary duty relating to the liquidation of the margin account; (2) there is no proximate cause "linking Icahn's alleged failure to notify Conway of trades or margin calls and Conway's losses" under the circumstances revealed; and (3), in the alternative, Icahn is entitled to a new trial because of the district court's restrictions on the use of medical records. On his cross-appeal, Conway challenges the district court's ruling that the jury's assessment of damages was duplicative as well as its ruling regarding the computation of interest.

## DISCUSSION

### I. Of Waiver.

■ Icahn's contention that Conway's express waivers preclude any claims for negligence or breach of fiduciary duty with regard to the liquidations in Conway's margin account is based upon the Customer Agreement entered into between Cowen and Conway. That agreement provided Cowen with authority to sell any asset in the account in any manner and at any time, without notice, to satisfy any account indebtedness. It is well-settled that provisions of this nature are enforceable as between the parties to agreements that include such provisions. *See, e.g., Modern Settings, Inc. v. Prudential–Bache Sec., Inc.,* 936 F.2d 640, 644 (2d Cir.1991); *Geldermann & Co. v. Lane Processing, Inc.,* 527 F.2d 571, 576 (8th Cir.1975). Although Icahn was not a party to the Customer

Agreement at issue, it claims the benefits of the liquidation provision by virtue of its status as introducing broker.

■ A third party claiming to be a beneficiary of a contract must demonstrate that the parties to the contract intended at the time of contracting to confer the benefit claimed. *Port Chester Elec. Constr. Corp. v. Atlas,* 40 N.Y.2d 652, 389 N.Y.S.2d 327, 330, 357 N.E.2d 983, 985–86 (1976); Restatement (Second) of Contracts § 302 (1981). The rule is no different where an introducing broker seeks the benefit of an agreement between its customer and a clearing broker. *McPheeters v. McGinn Smith & Co.,* 953 F.2d 771, 773 (2d Cir.1992) (per curiam) (introducing broker not entitled to benefit of arbitration provision in Customer's and Margin Agreement between customer and clearing broker). In *McPheeters,* we cited with approval the district court's decision in *Church v. Gruntal & Co.,* 698 F.Supp. 465 (S.D.N.Y.1988), wherein it was determined that an introducing broker was not a third party beneficiary of arbitration clauses because the customer agreement did not specifically mention the introducing broker.

> By their terms, these clauses only bound plaintiff and [clearing broker]. The clauses made no mention of [introducing brokers] and no extrinsic evidence is suggested which would show an intent to benefit them as third party beneficiaries. Had plaintiff and [clearing broker] intended the arbitration clauses to benefit [introducing brokers], this intent could have been expressed in the clauses. It was not.

*Id.* at 467.

We are faced with the same factual scenario in the case at bar, except that we are dealing here with clauses in the agreement between Cowen and Conway that permit the sellout of an account without notice to satisfy indebtedness. These provisions make no mention whatsoever of Icahn. No extrinsic evidence has been introduced to demonstrate that the parties to the agreement intended Icahn to have the benefit of these provisions. Indeed, the evidence seems to indicate that Conway had no intention that Icahn have such a benefit. It would have been a simple matter to include Icahn as a party to the

Customer Agreement so that it could derive the benefits therein provided. Similarly, Icahn could have entered into a separate agreement including such provisions. It failed to do either and must suffer the consequences.

Claiming that it presents an "analogous situation," Icahn relies heavily on *Schenck v. Bear, Stearns & Co.,* 484 F.Supp. 937 (S.D.N.Y.1979). In that case, the value of certain bonds in Schenck's accounts began to decline shortly after he left for Paris. Schenck took no action, and his account continued to drop in value. While Schenck was enroute, his account was liquidated by Bear, Stearns, the clearing broker. Claiming irregularities in the liquidation, Schenck sued Bear, Stearns and Merkin, the introducing broker. The district court dismissed as to both defendants. The difference between that case and this is that in *Schenck,* the actual liquidation was conducted by the clearing broker in accordance with an agreement permitting it to do so. Although Icahn argues here that Cowen would have executed the liquidation if it did not, the fact remains that Icahn, having very different duties toward Conway, actually chose the stocks and sold them. The district court in *Schenck* also found as a fact that plaintiff was aware of the probability of a margin call and did nothing to reduce his indebtedness. Conway, on the other hand, testified to his assumption that no margin call on his account was appropriate because of the buying power in the account. Finally, to the extent that *Schenck* holds that there is no fiduciary duty on the part of the introducing broker in circumstances similar to those presented in the case at bar, we reject the holding.

## II. Of Proximate Cause.

■ In contending that there is no proximate cause linking Icahn's failure to notify Conway of trades or margin calls and Conway's losses, Icahn asserts that Conway received written disclosure of such information prior to the liquidations. In this connection, Icahn points to the "intervening written notifications" that Conway admits he received as well as to its argument that Conway's con-

duct in the circumstances was "unreasonable as a matter of law."

■■■ The relationship between a stockbroker and its customer is that of principal and agent and is fiduciary in nature, according to New York law. *See* 11 N.Y.Jur.2d Brokers § 45 (1981); *People v. Mercer Hicks Corp.*, 4 Misc.2d 55, 155 N.Y.S.2d 740, 744 (Sup.Ct.1956), *aff'd*, 3 A.D.2d 708, 160 N.Y.S.2d 806 (1957). A broker, as agent, has a duty to use reasonable efforts to give its principal information relevant to the affairs that have been entrusted to it. *See* Restatement (Second) of Agency § 381 (1958). Accordingly, because Conway's account was a non-discretionary one, his authorization for all purchases and sales was required. Absent a waiver of notice running in its favor, Icahn had a duty to notify Conway prior to the execution of the sellout and to secure his consent as to the items to be sold.

Conway admits to receiving only "minor margin calls" by mailgram on October 22 and October 23. As to those calls, he testified that he did not understand why they were sent, considering the buying power in his account. He received no other notifications in writing or by telephone, and he did not receive the margin call for 1.7 million dollars, according to his version of the events. The jury, of course, was free to believe that version. Conway was not even afforded the opportunity to designate which shares he wished to have sold to meet the margin call, an important factor for someone in Conway's position, especially considering the volatility of the market and the capital gain tax implications of the sales.

While it is true that Conway was aware of his purchases and of the declining market situation in the weeks before the massive selloff in his account, it cannot be said that his actions were unreasonable as a matter of law. Without the information that it was Icahn's duty to provide, Conway was not in a position to decide whether to cover the margin call with other assets that were available to him or to designate the securities he wished to sell. There was ample evidence for the jury to find that Conway's loss was the direct result of Icahn's negligence and breach of fiduciary duty. To say that there

is no causal chain "linking Icahn's alleged failure to notify Conway of trades or margin calls and Conway's losses" is to ignore in its entirety the evidence presented by Conway.

## III. Of Medical Records.

■■■ Icahn sought medical records relating to Conway's hospitalizations in 1978, 1986, 1987 and 1988 for the purpose of demonstrating that Conway was incapable of making investment decisions during the weeks following "Black Monday." All the records were marked for identification but only the admission records for the 1987 hospitalization were received in evidence. Medical records pertaining to alcohol abuse are deemed confidential and need not be disclosed in the absence of a court order granted after a finding of "good cause" for their release. 42 U.S.C. § 290dd–3(b)(2)(C) (1988). The probative value/unfair prejudice balancing required by Fed.R.Evid. 403, performed by the district court with regard to the medical records in this case, is a matter confided to the discretion of the district court. *See George v. Celotex Corp.*, 914 F.2d 26, 26 (2d Cir.1990); *McNeilab, Inc. v. American Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir.1988). A Rule 403 determination by the district court will be overruled only when it can be said that the district court abused its discretion. *See Chnapkova v. Koh*, 985 F.2d 79, 81 (2d Cir.1993).

In making available to counsel for Icahn the 1987 admission records and in receiving in evidence the portions of those records specified by counsel, the district court did not abuse its discretion. Obviously, the court found "good cause" to reveal the 1987 records to counsel, since the hospital admission came at the end of the period when Icahn claims that Conway sustained his losses by reason of inability to manage his financial affairs. It was Conway's conduct at the time immediately prior to that hospitalization that was critical to the point that Icahn was attempting to make. The district court acted well within its discretion in deciding that the other hospitalization records would be more prejudicial than probative.

█ It is questionable whether the 1978, 1986 and 1988 hospital records could be considered "relevant" within the meaning of Fed.R.Evid. 401 in any event. To be relevant, evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. Unless a district court's determination of relevance is arbitrary or irrational, it will not be overturned. *See United States v. Torres,* 901 F.2d 205, 234–35 (2d Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). It would not be irrational or arbitrary to say that the excluded hospitalization records did not tend to make more probable the inability of Conway to attend to his financial affairs during the period under scrutiny. In this connection, it is notable that the evidence that *was* placed before the jury enabled the jury to find that Conway was 48% at fault for the losses he sustained.

█ Finally, Icahn contends that the admission in evidence of the 1987 records on the final day of trial "came too late and comprised too little for the defense to present its proposed expert testimony concerning the effect of Conway's alcoholic stupor both on his capacity to recall events and on his ability to respond to the margin calls when he received them." The short answer to this contention is that Icahn failed to request a recess in the trial in order to call the expert after the records were admitted. Icahn also had the option of recalling Conway or any other witness to the witness stand for further examination based on the records received in evidence. Having failed to exercise these options, and having elected to use the records received only for purposes of argument on summation, Icahn cannot be heard to complain of lost opportunities.

## IV. Of Damages.

█ Contending that he is entitled to the jury's award of damages in the total amount of $714,480, Conway cross-appeals from the decision of the district court, made after a post-trial motion by Icahn, limiting the principal amount of the judgment to $357,240.

In response to interrogatories, as noted previously, the jury found damages in favor of Conway on the negligence claim in the sum of $687,000 but reduced that sum to $357,240 to account for Conway's contributory negligence; damages also were assessed at $357,-240 on the fiduciary duty claim. The district court held a colloquy with the foreperson of the jury after the verdicts were reported, and the foreperson indicated that the jury intended to make an award of $714,480.

█ Regardless of the jury's intentions, it is clear that the separate awards were duplicative and therefore impermissible as a double recovery. Where a plaintiff seeks recovery for the same damages under different legal theories, only a single recovery is allowed. *See Wickham Contracting Co. v. Board of Educ.,* 715 F.2d 21, 28 (2d Cir.1983) (separate recoveries under Sherman Act and Labor Management Relations Act for economic harm arising from unfair labor practices impermissible); *cf. Hughes v. Patrolmen's Benevolent Ass'n,* 850 F.2d 876, 882 (2d Cir.) (alternate tort theories may be submitted to jury but only single recovery allowed), *cert. denied,* 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988). Conway sought damages arising from the sellout of his account without notice on two different theories—negligence and breach of fiduciary duty. His theories of recovery were based on a single set of facts, and the economic loss sustained was predicated on those unitary facts. Under such circumstances, "the verdicts should be identical and a single recovery allowed." *Wickham,* 715 F.2d at 28.

Moreover, the amount awarded on the breach of fiduciary duty claim can only be explained as a duplication of the amount awarded on the negligence claim because the latter represented a loss *reduced* by an allocation for Conway's contributory negligence. A full award for breach of fiduciary duty could not be reduced for contributory negligence, and it therefore seems clear that the negligence award simply was carried over to the fiduciary claim and an improper duplication resulted.

*Gentile v. County of Suffolk,* 926 F.2d 142 (2d Cir.1991), relied upon by Conway, is distinguishable. In that case, involving a brawl

between plaintiffs and police, the jury awarded damages of $150,000 for each plaintiff—$75,000 on a state claim for malicious prosecution and the same amount on a federal claim brought pursuant to 42 U.S.C. § 1983. In upholding the awards, we found it "conceivable" for the jury to conclude "that each plaintiff suffered $150,000 worth of discrete, unduplicated injuries as a result of the County's violations of law, and merely split the total amount equally between the state and federal causes of action in announcing their award to the court on the form submitted to it." *Id.* at 154. In the case at bar, we do not find it conceivable that the jury split Conway's sellout losses between the two claims submitted to it. Finally, in *Gentile*, there was substantial evidence of *multiple* injuries from the violations of state and federal rights. *Id.* at 153. There was but one injury suffered by Conway and that injury gave rise to a single item of damages.

V. Of Pre–Judgment Interest.

■ Conway argues that the district court erred in awarding interest from the date the action was commenced and offers the following dates from which to compute interest: October 28, 1987, when the sellout was completed; February 29, 1988, when Conway learned that the sellout would not be reversed; April 15, 1988, when Conway accrued tax liability as a result of the sellout; and April 28, 1988, when Conway's expert deemed it reasonable for Conway to have digested the sellout and its tax consequences. Conway does not link all his losses to any certain date or time, but seems to indicate that he incurred damages at various times over the course of several months. Moreover, the parties have provided no assistance to us in identifying an appropriate date.

■ Pre-judgment interest in New York is governed by the following rule:

Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

N.Y.Civ.Prac.L. & R. § 5001(b) (McKinney 1992 & Supp.1994). Accordingly, where damages are incurred at various times after the cause of action accrues, section 5001 grants courts wide discretion in determining a reasonable date from which to award prejudgment interest. *See Cotazino v. Basil Dev. Corp.*, 167 A.D.2d 632, 562 N.Y.S.2d 988, 991 (1990) (interest accrued as of date of commencement of action). *Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085 (2d Cir.1992), upon which Conway relies, provides no assistance here. *Ginett* involved a claim for severance benefits based upon a breach of contract where the underlying contract stated the date from which severance should be awarded. The court thus was able to determine the date that the damages were incurred and award interest from that date.

Here, Conway himself is uncertain as to when he actually incurred the damages that he sustained. The jury was not asked to specify a date when the damages were incurred, and it therefore was not unreasonable for the court to choose the date of the commencement of the action in accordance with the New York Rule. *See Della Pietra v. New York*, 125 A.D.2d 936, 510 N.Y.S.2d 334, 337 (1986) (where precise date is ambiguous, date of commencement is appropriate); *Gelco Builders & Burjay Constr. Corp. v. Simpson Factors Corp.*, 60 Misc.2d 492, 301 N.Y.S.2d 728, 731 (Sup.Ct.1969) (where court cannot determine single reasonable intermediate date, date of commencement is appropriate). It cannot be said that the district court abused its discretion in awarding prejudgment interest from June 9, 1989, the date the action was commenced.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed in all respects.