UNITED INTERNATIONAL HOLDINGS, INC., et al., Plaintiffs,

v.

THE WHARF (HOLDINGS) LIMITED, et al., Defendants

No. 18–M–0302 (RWS).

United States District Court, S.D. New York.

Dec. 22, 1997.

---

Fox, Horan & Camerini, New York, NY, John R. Horan, Oleg Rivkin, Of Counsel, for Plaintiffs.

Cleary, Gottlieb, Steen & Hamilton, New York, NY, George Weisz, David H. Herrington, Of Counsel, for Krikler Ltd.

## OPINION

SWEET, District Judge.

Petitioner United International Holdings, Inc. ("UIH") makes this application for an order pursuant to Rule 69, Fed.R.Civ.P., directing Chase Manhattan Bank (the "Bank") to turn over funds to UIH which are due to be paid pursuant to a certain Master Agreement (the "Swap Agreement") between the Bank and Krikler Limited ("Krikler"). For the reasons set forth below, the application is denied.

### Parties

UIH is a Delaware corporation, with its principal place of business in Denver, Colorado.

The Wharf is incorporated under the laws of Hong Kong.

Krikler is a wholly owned subsidiary of the Wharf. Krikler was incorporated on June 7, 1994 under the laws of the British Virgin Islands. Its address is in Tortola, British Virgin Islands.

### Prior Proceedings

This application was brought by order to show cause in Part I of this Court before the Honorable Robert P. Patterson on October 1, 1997. UIH applied for an order directing the Bank to turn over funds which were due to be paid to Krikler, a wholly owned subsidiary of the Wharf, pursuant to a Swap Agreement entered by the Bank and Krikler on November 3, 1994. Hearing on the application was heard before this Court on November 4, 1997.

### Facts

On May 21, 1997, UIH obtained a judgment against the Wharf in United States District Court for the District of Colorado, in an action for fraud, securities fraud, breach of contract and breach of fiduciary duty against the Wharf, against a wholly owned subsidiary of the Wharf, and against the Wharf's vice-chairman Stephen Ng. *United International Holdings, Inc. v. The Wharf (Holdings) Limited, et al.,* 174 F.R.D. 479 (D.Colo.1997), (the "Colorado Action"). The Colorado Action arose out of the Wharf's refusal to allow UIH to invest in a Hong Kong cable television franchise the Wharf had been awarded with UIH's help. The judgment was for over $150 million against the Wharf.

On July 11, 1997 and September 18, 1997, UIH served two restraining notices (the "Restraining Notices") on the Bank which forbade the Bank from transferring:

Funds drawn or requested to be drawn on [the Bank] at the direction or for the bene-

fit of judgment debtor(s) in connection with a certain Swap Agreement dated November 3, 1994 between [the Bank] and Krikler Limited.

The Swap Agreement referred to in the Restraining Notices had been executed between the Bank and Krikler, another wholly owned subsidiary of the Wharf.

### The Formation of Krikler

Krikler was incorporated on June 7, 1994 in the British Virgin Islands. Shares of Krikler are owned by Farrowsham Limited, which is also incorporated in the British Virgin Islands. The shares of Farrowsham Limited are owned by Hebrow International Limited, another BVI corporation. The shares of Hebrow International Limited are owned by Wharf International Limited, which is incorporated in the Grand Cayman Islands, British West Indies. The shares of Wharf International Limited are owned by the Wharf.

While Krikler maintains its own balance sheets and profit and loss statements, it does not maintain its own bank account. Rather, Krikler utilizes the bank accounts of affiliated entities. When the affiliates receive or pay monies on behalf of Krikler, these credits or debits are recorded in intercompany current accounts, which reflect that the money received belongs to Krikler.

### The Swap Agreement

Negotiation of the Swap Agreement began in October 1994, four months after Krikler was incorporated. Negotiations were conducted between the Bank and the Wharf. Initial drafts of the Swap Agreements indicate that the Bank did not yet know which of the Wharf's off-shore subsidiaries would be designated by the Wharf to execute the Swap Agreement. The swap counter party was described only as a "wholly owned subsidiary of Wharf." By fax dated November 26, 1994, the Wharf informed the Bank that it was going to use Krikler Limited "a new BVI company", as the swap counter party. The Bank's internal documents describe the Wharf, rather than Krikler, as the obligor of the agreement, the customer on this transaction, and the borrower.

The Swap Agreement is actually composed of two connected agreements: a master agreement dated November 3, 1994, (the "Master Agreement") and an amended confirmation of the Master Agreement dated April 4, 1995, (the "Confirmation"). The two documents form a single agreement, where terms of the Confirmation prevail if there is any inconsistency. Where there is no inconsistency, or where the Confirmation is silent, terms of the Master Agreement prevail. The Confirmation may be amended for each transaction which occurs under the Swap Agreement. The Master Agreement provides that New York law will govern.

In the Swap Agreement, Krikler and the Bank agree to respective interest payment obligations, based on different methods of measuring interest. The Bank acts as a Fixed Rate Payer, and its obligation is based on six months' interest on $100 million at an annual rate of 8.875%. Krikler acts as a Floating Rate Payer, and its obligation is based on six months' interest on $100 million at a floating interest rate tied to LIBOR. If the floating rate for a six month period is equal to 8.875%, neither Krikler nor the Bank will make a payment to the other for that period. If the floating rate is lower than 8.875%, the Bank will make a payment to Krikler based on the difference between the two rates; if the opposite is true, Krikler pays the Bank the difference. Payments are made on May 1 and November 1 of each year, starting with 1995 and terminating in 2004. The Confirmation states that credit support for Krikler's payment obligations is provided by a guaranty from the Wharf (the "Guaranty"). The Guaranty was executed on November 3, 1994.

The Master Agreement states that each party will designate the account for receiving payments, and that each party may change its account for receiving payment within five business days before payment is due. The Confirmation designated the Wharf's account at the New York branch of the Hong Kong and Shanghai Bank as the receiving account for any payments made by the Bank to Krikler.

The Master Agreement also contains a non-assignment clause, which states:

Subject to Section 6(b)(ii) [concerning the transfer of rights after 20 days notice in order to avoid termination of the Agreement by default or illegality] neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—(a) a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and (b) a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e). Any purported transfer that is not in compliance with this Section will be void.

On April 29, 1997, the same day as judgment was entered in the Colorado Action, Krikler sent a fax from the Wharf's offices in Hong Kong to the Bank, changing its payment account under the Swap Agreements to that of Wharf International Investments Ltd., ("WII"), at the Hong Kong branch of the Hong Kong and Shanghai Bank. WII is another wholly owned subsidiary of the Wharf, and is also owned indirectly by Krikler's immediate parent, Farrowsham Limited. The Bank followed these revised instructions in making its payments on May 1, 1997, and would send the November 3, 1997 payment to WII were it not currently subject to UIH's restraining orders.

### Discussion

UIH contends that the Wharf is a third-party beneficiary under the Swap Agreement, and therefore the funds payable to Krikler are subject to turnover to its judgment creditor, UIH. UIH further asserts that the change in payment instructions on April 29, 1997 constituted a fraudulent conveyance by the Wharf to avoid payment of judgment.

### A. The Wharf is not a Third–Party Beneficiary to the Swap Agreement

■ The test for third-party beneficiary status, as adopted by New York law from the

Restatement (Second) of Contracts is as follows:

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

Restatement (Second) Contracts § 302 (1979); *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 44–45, 485 N.E.2d 208, 212, 495 N.Y.S.2d 1,5 (1985) (adopting Restatement (Second) Contracts § 302).

■ A third party is allowed to enforce a contract if that party is an intended beneficiary of the contract. *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 600 (2d Cir. 1991). If the obligation to perform to the third-party beneficiary is not expressly stated in the contract, the court may look to surrounding circumstances to determine whether the contracting parties intended to benefit a third party. *See Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 573 (2d Cir.1991); *see also, Septembertide Publishing B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 679 (2d Cir.1989). The terms of the Swap Agreement do not explicitly name the Wharf as a third-party beneficiary; the Wharf is only mentioned as a guarantor of Krikler's payment obligations. The Court must thus look to the intention of the parties, as inferred from the surrounding circumstances, to determine the Wharf's status.

■ When determining the intentions of the contracting parties, the intention of the promisee governs. *Fourth Ocean*, 66 N.Y.2d at 44, 485 N.E.2d at 212, 495 N.Y.S.2d at 5 ("Essential to the status as an intended beneficiary ... is that the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised perfor-

mance.'') (internal citations and quotation marks omitted); *BAII Banking Corp. v. UPG, Inc.*, 985 F.2d 685, 697 (2d Cir.1993) ("A beneficiary of a promise is an intended third party beneficiary when, *inter alia*, recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and the performance will satisfy an obligation of the promisee to pay money to the beneficiary."); *Sazerac Company, Inc. v. Falk*, 861 F.Supp. 253, 258 (S.D.N.Y.1994) (citing *Drake v. Drake*, 89 A.D.2d 207, 209, 455 N.Y.S.2d 420, 422 (4th Dept.1982)). UIH contends that, because the Bank considered the Wharf its customer, obligor and borrower in this transaction, an intent to benefit the Wharf has been established. But Krikler, not the Bank, is the promisee as regards benefits to the Wharf. Therefore Krikler's intentions must be the focus of third-party beneficiary analysis.

Analysis of Krikler's intention is hampered by the fact that there is little evidence of an intent on the part of that corporation; the Wharf conducted all negotiations for the Swap Agreement. Krikler was added as the executing party only after all provisions had been completed. Whether Krikler could be said to have an "intent" in this transaction or not, the terms of the Swap Agreement indicate that its purpose was to obtain payments from Chase for Krikler's own credit. There is no indication that a benefit was intended for the Wharf. All UIH can show is that the promisee intended to enter an agreement which might provide payments to one of the Wharf's wholly owned subsidiaries, and the newly-formed Krikler was selected for receipt of those payments. UIH cannot point to any benefit which derives directly to the Wharf from the Agreement, from the negotiations of the Agreement, or from the selection of Krikler as party to the Agreement.

■ Given the unique circumstances surrounding the formation of the Swap Agreement, a more productive test for third-party beneficiary status would be whether benefits flowed directly to the Wharf from performance of the contract. Where performance is to be rendered directly to a third party under the terms of an agreement, that third party is conclusively deemed an intended beneficiary of the agreement. *Flickinger*, 947 F.2d at 600 (citing *Cauble v. Mabon Nugent & Co.*, 594 F.Supp. 985, 991 (S.D.N.Y.1984)). UIH contends that the provision for payments to the Wharf's bank account constituted a direct benefit to the Wharf. However, the Wharf has demonstrated that the payments to its account were the result of Krikler's lack of a bank account; the monies were credited to Krikler on the intercompany accounts. UIH has not established that receipt of the payments provided a direct benefit to the Wharf beyond that provided to any parent corporation from assets held by its wholly owned subsidiaries, and this indirect benefit is insufficient to establish third-party beneficiary status in the Wharf.[1]

*Conway v. Icahn & Co., Inc.*, 16 F.3d 504 (2d Cir.1994) presents an analogous factual circumstance, in which an introducing broker attempted to assert third-party beneficiary status to a contract executed between its customer and the clearing broker. The Second Circuit held that third-party beneficiary status had not been established where the intent to benefit the introducing broker could have been expressed in the contract but was not, and where extrinsic evidence made no indication that the customer intended for the introducing broker to benefit from the contract. *Id.*, at 509. In the instant case, the Wharf could be termed the "introducing broker"; it established a relationship with the Bank, and brought Krikler as a "customer" to the Swap Agreement negotiated with the Bank. The Swap Agreement existed between Krikler and the Bank, each of whom intended only to benefit itself. While the Wharf

---

1. The issue of whether Krikler or the Wharf controlled the execution and performance of the Swap Agreement raises the question of whether UIH should seek to pierce the corporate veil between the parent and subsidiary. UIH has explicitly disavowed this argument. Memorandum of Law of United International Holdings, Inc., at 14 ("The argument of Krikler's counsel ... that Krikler is an independent entity with its own 'corporate will' is contradicted by the record. But more importantly, it is beside the point. Even if Krikler was [sic.] a company with the size, independence and 'will' of IBM, it would still be only a 'nominee' for purposes of this transaction and WHARF HOLDINGS would still be the beneficiary of the Swap Agreement.")

indirectly profits from the introduction of Krikler as party to the Agreement, the benefit, like that to the introducing broker in *Conway*, is too indirect to establish third-party beneficiary status.

■ Courts have found that third-party status may be established where only the third party may recover if the promisor breaches the contract; conversely, if another besides the third party may recover, beneficiary status is negated. *Fourth Ocean*, 66 N.Y.2d at 45, 485 N.E.2d at 212, 495 N.Y.S.2d at 5) (third party beneficiary rights only where it appears that no party other than third party can recover if promisor breaches the contract or where the contract clearly demonstrates an intent to allow enforcement by the third party); *Maggio v. Leeward Ventures, Ltd.*, 939 F.Supp. 1020, 1030 (E.D.N.Y.1996) ("Rather than duty, we have emphasized when upholding the third party's right to enforce the contract that no one other than the third party can recover if the promisor breaches the contract ...")(citing *Seaver v. Ransom*, 224 N.Y. 233, 239, 120 N.E. 639 (1918)); *John Street Leasehold LLC v. The Federal Deposit Insurance Corporation*, No. 95 Civ. 19174, 1996 WL 737196 (S.D.N.Y. Dec.24, 1996); *In re Houbigant*, 914 F.Supp. 964, 985 (S.D.N.Y.1995), *on reargument*, 914 F.Supp. 997 (S.D.N.Y.1996)(same); *Sazerac*, 861 F.Supp. at 258. In *Maggio*, 939 F.Supp. 1020, the plaintiff asserted third-party beneficiary status in regard to a consent order entered in an underlying foreclosure action, which required defendants to sell and convey mortgaged property. The district court found no third-party beneficiary status where "[t]he parties to the Consent Order can fully comply with its terms without any benefit flowing to [plaintiff]." *Id.*, at 1031. *See also, John Street*, 1996 WL 737196 at *10 (no beneficiary status for plaintiff to agreement between FDIC and participating banks, because "the banks were quite capable of suing if there was a breach of agreement among the banks.") In the instant case, Krikler had the right to bring an action should the Bank have breached, not the Wharf.

Furthermore, the Swap Agreement contains a non-assignment clause which states that no party may transfer "any interest or obligation" under the Swap Agreement without the prior written consent of the others.

■ This provision indicates that Krikler cannot give the right to enforce the Swap Agreement or sue for breach unless it has first obtained the consent of the Bank. Non-assignability clauses have been held to negate third-party beneficiary status, even where assignment was permitted with prior written approval. In *Sazerac*, the plaintiff purchased part of the assets of a corporation previously purchased by another party from the defendants. The plaintiff brought a claim against the defendants for failure to disclose certain liabilities in the business operations being sold. *Sazerac*, 861 F.Supp. at 257. The Court held that plaintiff was not a third-party beneficiary because no express intent to benefit plaintiff could be construed from the terms of the sales agreement, and the existence of a clause prohibiting assignment "without the prior written consent of the other parties" barred any third-party beneficiary claims. *Id.*, at 258. *See also, MacDraw, Inc. v. CIT Group Equipment Financing, Inc.*, No. 91 Civ. 5153, 1994 WL 17952, at *13 (S.D.N.Y.1994), *reversed on other grounds*, 73 F.3d 1253 (2d Cir.1996) (where provision forbade assignment without prior written consent, fact that promisee never obtained promisor's permission to transfer rights to plaintiff negated plaintiff's third party beneficiary status). Here, as in *Sazerac* and *MacDraw*, the Wharf could not be termed a third-party beneficiary unless Krikler had obtained the Bank's permission to assign Krikler's interest in the agreement to the Wharf.

■ UIH contends that Krikler's direction to the Bank to begin depositing payments to WWI rather than the Wharf constitutes a fraudulent conveyance. Section 273–a, N.Y. Debt. & Cred. Law, states that:

Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard

to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment. N.Y. Debt. & Cred. Law, § 273–a (McKinney's 1990). As an initial matter, this statute cannot apply to Krikler who is not a defendant in the Colorado Action. Moreover, because UIH has not established that the Wharf holds an interest in payments to Krikler under the Swap Agreement, it cannot contend that the change in payment directions constituted a "conveyance". Section 270 defines "conveyance" as "every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance." N.Y. Debt. & Cred. Law, § 270 (McKinney's 1990). An altered payment direction is not an assignment or transfer, which, in any case, would be void without the Bank's prior written permission. Krikler retains an interest in the payments; they are still credited to Krikler on intercompany accounts. Payment is merely deposited in a different bank account.

Finally, UIH contends that any payments made by the Bank pursuant to the Swap Agreement may be turned over to UIH in satisfaction of its judgment in the Colorado Action, pursuant to §§ 5227 and 5225(b), N.Y.C.P.L.R. Section 5227 provides in relevant part:

> Upon a special proceeding commenced by the judgment creditor against any person who it is shown is or will be indebted to the judgment debtor, the court may require such person to pay to the judgment creditor the debt upon maturity . . .

N.Y.C.P.L.R. § 5227 (McKinney's 1978). Section 5225(b) provides in relevant part:

> Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest . . . where it is shown that the judgment debtor is entitled to the possession of such property . . . the court shall require such person to pay the money . . . to a designated sheriff.

N.Y.C.P.L.R. § 5225(b) (McKinney's 1995). When applied to a turnover proceeding involving property held by a third party, the two sections cited above are "generally . . . interchangeable." Siegel, *New York Practice,* § 510 (1991).

The Second Circuit has established a two-prong test for analyzing claims under § 5225(b), whereby the creditor must show (1) that the debtor has an interest in the property the creditor seeks to reach, and (2) either the judgment debtor is entitled to the possession of the property or the creditor's rights are superior to those of the possessing party. *Beauvais v. Allegiance Securities, Inc.,* 942 F.2d 838, 840 (2d Cir.1991). "Only after both steps of the analysis are demonstrated may the trial court order the transferee to turn over the property to the judgment creditor . . ." *Id.,* at 840–41. UIH cannot establish the first prong of the test, because it has failed to demonstrate that the Wharf has an interest in the Bank's payments pursuant to the Swap Agreement. As set forth above, the Wharf's receipt of funds in its bank account does not constitute an enforceable interest. Rather, the Wharf held the funds and credited them to Krikler, its wholly owned subsidiary. The Wharf was not an assignee or transferee of Krikler's interest in the Swap Agreement. Because it cannot meet the first prong of the test, UIH's turnover claim cannot prevail.

### Conclusion

For the reasons set forth above, UIH's motion for an order directing the turn over of payments owed to Krikler is denied.

It is so ordered.