**Mitchel and Sheri CRICCHIO;  John and Connie Locke;  and Gordon and Sally Yoast**

v.

**Alan DYCKMAN, Individually and as Employee and Agent of Northeast Securities, Inc., et. al.**

#### No. 1:99CV442.

United States District Court,
E.D. Texas,
Beaumont Division.

Jan. 14, 2000.

---

Deborah Breen Junek, Gwinn & Roby, Dallas, TX, for plaintiff.

Alan Dyckman, pro se, St Petersburg, FL, J Hoke Peacock II, Orgain Bell & Tucker, Beaumont, TX, Robert Stanford Harrell, Elaine L Lawson, Fulbright & Jaworski, Houston, TX, David J Fisher, Orgain Bell & Tucker, Silsbee, TX, Patrick J Solis, pro se, Duluth, GA, for defendant.

## MEMORANDUM OPINION

COBB, District Judge.

Before this court is defendant Northeast Securities, Inc.'s Motion to Compel Arbitration. In this action, there are three sets of plaintiffs: Mitchel and Sheri Cricchio; John and Connie Locke; and Gordon and Sally Yoast. This motion seeks arbitration of the claims asserted by the Cricchios and the Lockes only.

On December 21, 1999, this court held a hearing to consider the defendant's motion. For the reasons stated below, this court compels arbitration of the claims brought by the Cricchios and the Lockes.

## I. BACKGROUND.

Plaintiffs initially made investments using Alan Dyckman as their broker when he was employed by Josephthal, Lyons & Ross (JL & R). Sometime in June of 1997, Dyckman left JL & R and joined Northeast Securities, Inc. (Northeast). The plaintiffs followed him, transferring their accounts. This lawsuit arises out of an investment (the Swiss Investment) which was promoted and recommended to the plaintiffs in the Fall of 1997 by Dyckman and another broker, Ronald Zajack when both were employees and registered representatives of Northeast. During the entire time, there was no association between JL & R and Northeast, however, both brokers used Bear Stearns Securities Corp. (Bear Stearns) for their securities transactions. In the terms of the trade, JL & R and Northeast were both "broker-dealers" while Bear Stearns was the "clearing broker."

When the Cricchios and Lockes invested their money with JL & R, they entered into several agreements with Bear Stearns that contained arbitration provisions. It is these agreements which Northeast argues permit it to compel arbitration. However, when the plaintiffs transferred their accounts to Northeast, no new Customer Service Agreements or Options Agreements were executed. The Cricchios and Lockes claim this failure to execute new agreements precludes Northeast from compeling arbitration because it was not intended to be a third-party beneficiary.

## II. THE RELEVANT ARBITRATION PROVISIONS.

### A. The Cricchios

On September 13, 1993, Plaintiffs Mitchel and Sheri Cricchio signed four Customer Agreements: one together (No. 689–02707–776), one signed only by Mitchel Cricchio (No. 689–95467–776), and two

signed only by Sheri Cricchio (Nos. 689–15479–776 and 688–95534–15–B26). The agreements are identical and state in pertinent part:

> YOU AGREE, AND BY MAINTAINING AN ACCOUNT FOR YOU BEAR STEARNS AGREES, THAT CONTROVERSIES ARISING BETWEEN YOU AND BEAR STEARNS, ITS CONTROL PERSONS, PREDECESSORS, SUBSIDIARIES AND AFFILIATES AND ALL RESPECTIVE SUCCESSORS, ASSIGNS, AND EMPLOYEES, WHETHER ARISING PRIOR TO, OR SUBSEQUENT TO THE DATE HEREOF, SHALL BE DETERMINED BY ARBITRATION.

Paragraph 22 of the Customer Agreement also acknowledges the possibility of arbitration between a broker-dealer and the customer when it provides:

> FOR ANY ARBITRATION SOLELY BETWEEN YOU AND A BROKER FOR WHICH BEAR STEARNS ACTS AS A CLEARING AGENT, SUCH ELECTION SHALL BE MADE BY REGISTERED MAIL TO SUCH BROKER AT ITS PRINCIPAL PLACE OF BUSINESS.

In addition, paragraph 8 of the Customer Agreement specifies in pertinent part:

> You agree that your broker and its employees are third-party beneficiaries of this Agreement, and that the terms and conditions hereof, including the arbitration provision, shall be applicable to all matters between or among any of you, your broker and its employees, and Bear Stearns and its employees.

These agreements were signed when the Cricchios used JL .& R as their broker-dealer.

In August 1995, Mitchel Cricchio also signed an Options Information Form and Agreement (No. 689–9547613) which contained an arbitration provision identical to the one contained in the Customer Agreements mentioned above. The Options Agreement also contains the following language in paragraph 8:

> Because Bear Stearns is acting as a clearing agent for a correspondent broker-dealer, the terms of the agreement, including the arbitration provision, shall inure likewise to the benefit of my broker-dealer, its successors and assigns, and all references to Bear Stearns Securities shall be deemed references to both Bear Stearns and my broker-dealer.

This agreement was also signed when the Cricchios were using JL & R as their broker-dealer.

**B. The Lockes**

Plaintiff John Locke signed a Customer Agreement (No. 689–05292–1–4) which contained a similar arbitration provision to the one signed by the Cricchios. It states in pertinent part:

> YOU AGREE, AND BY MAINTAINING AN ACCOUNT FOR YOU BEAR STEARNS AGREES, THAT CONTROVERSIES ARISING BETWEEN YOU AND BEAR STEARNS SECURITIES CONCERNING YOUR ACCOUNTS OR THIS OR ANY OTHER AGREEMENT BETWEEN YOU AND BEAR STEARNS SECURITIES, WHETHER ENTERED INTO PRIOR TO, ON OR SUBSEQUENT TO THE DATE HEREOF, SHALL BE DETERMINED BY ARBITRATION.

Paragraph 22 of the Customer Agreement also acknowledges the possibility of arbitration between a broker-dealer and the customer when it provides:

> FOR ANY ARBITRATION SOLELY BETWEEN YOU AND A BROKER FOR WHICH BEAR STEARNS ACTS AS A CLEARING AGENT, SUCH ELECTION SHALL BE MADE BY REGISTERED MAIL TO SUCH BROKER AT ITS PRINCIPAL PLACE OF BUSINESS.

In addition, paragraph 8 of the Customer Agreement is similar to the Cricchios and specifies in pertinent part:

> You agree that your broker (including Bear, Stearns & Co., Inc.) is a third-party beneficiary of this Agreement, and that the terms and conditions hereof, including the arbitration provisions, shall be applicable to all matters between or among any of you, your broker or Bear Stearns and its employees.

Like the Cricchios, this Customer Agreement was signed when the Lockes were using JL & R as their broker-dealer.

John Locke also signed an Options Information form and Agreement (No. 815–30189–1–9) on May 14, 1997 which contained identical provisions to the form signed by Mitchel Cricchio mentioned

above. This form however, was signed after the Lockes began using Northeast as their broker-dealer. The Lockes however, contend that this provision does not apply because the money which was used in the Swiss Investment did not come from this account.

## III. ANALYSIS

■ The Federal Arbitration Act provides that arbitration clauses in contracts are valid and enforceable. 9 U.S.C. § 2 (1999). If jurisdiction is proper and one of the parties applies, the court will direct the parties to proceed to arbitration in accordance with the terms of the agreement. *Id.* at § 3 and § 4. This involves a two-step process. First, the court will determine whether a valid agreement exists. Second, the court will determine whether the dispute is within the scope of the agreement. *See Nationwide of Bryan, Inc. v. Dyer,* 969 S.W.2d 518, 520 (Tex.App.—Austin 1998, no pet.); *Shearson Lehman Hutton, Inc. v. McKay,* 763 S.W.2d 934, 936 (Tex. App.—San Antonio 1989, no writ).

Under Federal law, there is a strong presumption in favor of arbitration. The Supreme Court has instructed:

> "that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.... The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *Mitsubishi Motors v. Soler Chrysler–Plymouth,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). Whether the parties agreed to arbitration is determined by ordinary contract principles. *Ziegler v. Whale Securities Co., L.P.,* 786 F.Supp. 739, 741 (N.D.Ind.1992); *Fox v. Merrill Lynch & Co.,* 453 F.Supp. 561, 564 (S.D.N.Y.1978).

The arbitration clauses in the agreements at issue are broad in scope. There is no language in the agreement which limits the range of disputes. Paragraph 8 of the Customer Agreements applies to "all matters between or among any of you, your broker and its employees, and Bear Stearns and its employees." Thus the question in the present case is whether a valid agreement to arbitrate exists between Northeast and the Cricchios and Lockes.

■ The answer to this question requires the court to determine whether Northeast was a third-party beneficiary to the agreements. Non-signatories to arbitration agreements can enforce them if they are third-party beneficiaries. For a third-party to enforce a contract, the parties to that contract must have intended to "confer a benefit on him when contracting; it is not enough that some benefit incidental to the performance of the contract may accrue to him." *Whisler v. H.J. Meyers & Co.,* 948 F.Supp. 798, 801 (N.D.Ill.1996); *see also Conway v. Icahn & Co.,* 16 F.3d 504, 509 (2d Cir.1994). In fact, a third party beneficiary need not be mentioned by name, a general reference, *i.e.,* "broker-dealer," will suffice. *Ziegler,* 786 F.Supp. at 743. In *Ziegler,* a client (Ziegler) sued his broker (Brody) and Brody's employer Whale Securities. Brody managed Ziegler's accounts with another broker-dealer, Cowen & Co. (Cowen). According to industry jargon, Whale was the "introducing broker" and Cowen was the "clearing broker." The court held that Whale could enforce the arbitration clause in the Margin Agreement even though Whale was mentioned only by the term "broker-dealer." *Ziegler,* 786 F.Supp. at 743.

■ However, agreements will not be enforced where the broker-dealer is not mentioned as a third-party beneficiary. *See Taylor v. Investors Assocs., Inc.,* 29 F.3d 211, 213 (5th Cir.1994); *McPheeters v. McGinn, Smith and Co.,* 953 F.2d 771 (2d Cir.1992) (holding contract evidenced no intent to include non-signatory as a

third-party beneficiary status where the non-signatory was not mentioned in any way in the agreement). In *Taylor*, the Fifth Circuit refused to permit the broker-dealer to compel arbitration where the only parties referenced in the agreement were the client and the clearing broker. The broker-dealer was not mentioned at all—not even in general terms. The Fifth Circuit rejected the broker-dealer's argument that it was included in the term "you" when "you" was defined by the agreement to mean the clearing broker.[1] In the present case, both the Customer Agreements and the Options Agreements specifically state that broker-dealers and their assigns are third-party beneficiaries who are subject to the arbitration provisions. Thus the situations addressed by courts in *Taylor* and *McPheeters* are inapplicable to the present case.

The Cricchios and Lockes next argue that the agreements do not apply because they signed the agreements when JL & R was their broker-dealer; since Northeast was not their broker-dealer when they signed, the parties could not have intended Northeast to be the third-party beneficiary. Plaintiffs rely on Exhibit 13, a computer generated document from Northeast which is titled: "Margin Violation, First Notice." The documents states that there is no signed Customer Agreement on file for John Locke's account and that unless one is received, that the account will be restricted from "non-liquidating margin transactions." There is also a hand-written note which reads: "Please transfer documentation from 689–05292–1–4."[2] This is the same account number that is on the Customer Agreement which Locke signed with JL & R.

Plaintiffs claim that Exhibit 13 is evidence that Bear Stearns did not intend to have the JL & R agreements apply to the Northeast accounts. Northeast takes the position that the Customer Agreements and Options Agreements signed when the Cricchios and Lockes were using JL & R as their dealer-broker apply to their present relationship with Northeast. When they changed broker-dealers, the Lockes and Cricchios signed letters authorizing the journaling of all cash balances and all security positions from the old JL & R account number to the new Northeast account. (Exhibits 8–12 in Plaintiffs' Response). Northeast contends that original agreements still apply because the only thing that changed was the name of the broker-dealer.

In an affidavit submitted to the court, Mary Farriggio, a Northeast employee familiar with the Bear Stearns requirements, stated that in situations where the clients change broker-dealers, Bear Stearns does not require that new Customer Agreements be signed. Instead, she claims, the original agreements are still in effect after the transfer. In her affidavit, Farriggio explains that Exhibit 13 was generated because the paperwork for one of Locke's accounts was not yet filed—hence the notation to transfer the documents from the old account number.[3]

## VI. CONCLUSION

In light of the evidence before me, it is clear that the transfer of the accounts only affected the account numbers and that Bear Stearns intended that the agreements apply to the new accounts. The only evidence which might suggest that

---

1. The defendant broker-dealer's argument that it was included in the term "you" was based on the fact that it provided Taylor with the agreement. However, the only names on the agreement were Taylor's signature and the clearing-broker's letterhead.

2. In an affidavit submitted to the court, Mary Farruggio states that she wrote this note.

3. In a response submitted after the hearing, the Cricchios and Lockes argue Farriggio's affidavit is conclusory and self-serving. They request that she be deposed on the limited issue of her knowledge concerning Bear Stearns' requirements and procedures concerning account documentation and customer agreements. From all of the evidence presently before the court, including Farriggio's affidavit, the court is satisfied that there is no need for additional discovery on this issue.

the parties intended otherwise has been explained. Exhibit 13 reflects a concern on the part of Bear Stearns that there was no agreement *at all* with Mr. Locke. This is further evident because the situation was resolved by Ms. Farriggio's notation to transfer the documentation from the old account. Further, there were no similar notices for the accounts maintained by the Cricchios. An omission which suggests that Bear Stearns was satisfied that the original Customer Agreements were still applicable and enforceable after the Cricchios switched broker-dealers.

Moreover, a plain reading of the language in the agreement shows that the parties intended to confer third-party beneficiary status to the client's broker-dealer whomever that may be.[4] Although the account numbers were changed when they moved their accounts to Northeast, the accounts maintained Bear Stearns as the clearing broker and thus, the parties expected the terms of those agreements to continue to govern their relationship with Bear Stearns.

Even more damning for Locke's position is the fact that he signed the Options Agreement while Northeast was his broker. The mere fact that the money for the Swiss Investment was taken from a different account is irrelevant in the face of clear contractual language which states that claims between the client and the broker-dealer will be submitted to arbitration. By their own terms, the agreements are not limited in scope to the particular account for which they are numbered. Each of the provisions refers to "controversies arising between you and Bear Stearns" and specifically in the context of a dispute between the broker-dealer and the customer, the provisions of the Customer Agreement state that the arbitration provision is applicable to "all matters between or among any of you, your broker and its employees . . ." Thus, if any one of the agreements applies, then all disputes

between the broker-dealer and the client will be subject to arbitration.

The Lockes and Cricchios have argued that the parties to the agreements did not intend to include Northeast or any successor broker-dealer as a third-party beneficiary. In light of the evidence before the court and the strong Federal policy favoring arbitration, this evidence is insufficient to persuade the court that the parties did not so intend.

For the foregoing reasons, the Defendant Northeast's Motion to Compel Arbitration is GRANTED.

---

4. In fact, paragraph 8 of the Customer Agreement signed by the Cricchios includes the broker-dealer's employees as third-party beneficiaries. This would seem to permit Dyckman or Zajack to compel arbitration individually.