**Detroy LIVINGSTON, Plaintiff,**

v.

**Glenn S. GOORD, et al., Defendants.**

**No. 99–CV–6169L.**

United States District Court,
W.D. New York.

Sept. 30, 2002.

---

Detroy Livingston, Malone, NY, Pro se.

Gary M. Levine, NYS Attorney General's Office Department of Law, Rochester, NY, for Defendants.

## DECISION AND ORDER

LARIMER, Chief Judge.

Plaintiff, Detroy Livingston, appearing *pro se*, commenced this action under 42 U.S.C. § 1983 on April 21, 1999. Plaintiff filed an amended complaint on September 24, 1999.

Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), alleges a host of violations of his constitutional rights by DOCS officials and employees, all arising from events that took place at Attica Correctional Facility ("Attica"). The com-

plaint names twenty-one defendants[1] in fourteen separate causes of action. Defendants have moved for summary judgment on all claims except for plaintiff's allegation of excessive force on February 25, 1997.

## DISCUSSION

### I. Claims Raised in Plaintiff's Action in the Court of Claims

Defendants move for summary judgment on a number of claims on the ground that they are barred under principles of res judicata and collateral estoppel, due to plaintiff's successful prosecution of an action in the New York Court of Claims. On August 12, 1996, plaintiff filed an action against New York State in the Court of Claims, asserting a claim "for negligence of the State for allowing correction officers Fial, Bennis, and Justinger to assault" plaintiff on July 10 and 11, 1996, and a claim for "negligent medical treatment by Sergeant Cunningham, R.N.B. Schmidt, and R.N.S. Stewart for denying [plaintiff] proper medical treatment" following these assaults. Affirmation of James L. Gelormini, Esq. (Docket # 93), Ex. A.

On October 16, 2000, Judge Edgar C. Nemoyer of the Court of Claims rendered a decision finding "that more force than was necessary was used against" plaintiff, and awarding him a total of $3151.38 in damages, including $3000 "for all past and future pain, suffering, lack of proper medi-

cal attention, and any and all other damages he sustained as a result of the incidents on July 10 and 11, 1996." Gelormini Aff.Ex. B. On appeal by plaintiff challenging the adequacy of the award, the Appellate Division affirmed. *Livingston v. State,* 289 A.D.2d 973, 738 N.Y.S.2d 264 (4th Dep't 2001).

In the case at bar, plaintiff has alleged Eighth Amendment claims based on the same incidents, the same factual allegations, and the same actors. *See* Complaint, headings C–G. Defendants Bennis, Fial, Kauffman, Justinger, Cunningham, Schmitz, and Stewart are named in these claims.

Plaintiff argues that his Court of Claims proceeding should not operate as a bar to this action because in this action he seeks an award of punitive damages, a form of relief that was not available to him in the Court of Claims.[2] I am not persuaded by this argument.

A similar situation was presented in *Ramsey v. Busch,* 19 F.Supp.2d 73 (W.D.N.Y.1998). In *Ramsey,* the inmate plaintiff had filed a claim in the Court of Claims, which found for plaintiff and awarded him $200 in damages. The plaintiff then brought a § 1983 action in federal court against the individual officers involved in the underlying incident, based on the same set of facts. After an extensive analysis of the issue, the court held that "Ramsey's Eighth Amendment claim is

---

1. Plaintiff's claims against five other defendants have been dismissed over the course of this action.

2. Plaintiff recognizes that the Court of Claims decision "has already rendered him whole in regard[ ] to compensatory damages," Plaintiff's Memorandum of Law at 4, so that he could not recover any compensatory damages beyond the $3000 already awarded him in the Court of Claims. *See Conway v. Icahn & Co., Inc.,* 16 F.3d 504, 511 (2d Cir.1994) (where two theories of recovery are based on a single set of facts and economic loss sustained is

predicated on same facts, only a single recovery may be allowed); *Zarcone v. Perry,* 78 A.D.2d 70, 81, 434 N.Y.S.2d 437 (2d Dep't 1980) (where plaintiff had already recovered adequate damages in federal § 1983 action on the same facts constituting the injury alleged in his state court action, court held that in justice and fairness, no further recovery should be allowed, and claims were therefore properly dismissed), *aff'd,* 55 N.Y.2d 782, 447 N.Y.S.2d 248, 431 N.E.2d 974 (1981), *cert. denied,* 456 U.S. 979, 102 S.Ct. 2248, 72 L.Ed.2d 855 (1982).

barred by the doctrine of res judicata." *Id.* at 82. In so holding, the court noted that

> [t]he Court of Claims conclusively resolved the same set of facts on which both claims exist, *i.e.*, that Defendants acted improperly and violated Ramsey's legal rights. . . . The evidence necessary for Ramsey to prevail on his § 1983 claim is the same as the evidence he presented to prevail in the Court of Claims action based on the same incident. Both actions involve the same parties or their privies and the Court of Claims judgment was on the merits. Granting the Court of Claims' decision the finality which was intended in accordance with New York law, the court finds that permitting Ramsey's § 1983 action to proceed would destroy or impair the rights or interests afforded the parties by the first action, including the Defendants' rights to avoid being vexed by further litigation involving the identical facts and issues as those resolved in the prior case.

*Id.* at 85 (citation omitted).

The court also stated that its conclusion was not affected by the fact that the plaintiff sought punitive damages in his § 1983 action, a remedy not available in a New York Court of Claims action. *Id.* at 86. Noting that the purpose of punitive damages is to punish and deter wrongful conduct, not to compensate the victim for his injury, the court stated that "[a]n award of punitive damages to one who has already been made whole by compensatory damages is essentially a windfall to a plaintiff." *Id.* at 87 (citing *O'Neill v. Yield House, Inc.*, 964 F.Supp. 806, 810 (S.D.N.Y.1997)). The court also reasoned that "[t]he objectives of res judicata will not be advanced if the instant action is permitted to proceed to trial solely to determine if punitive damages may be awarded," since: the plaintiff had already been made whole by the compensatory damages awarded him by the Court of Claims; the Court of Claims award had "some deterrent effect," since individual officers would presumably not wish to be viewed by their employer as tortfeasors for whose conduct the employer could be liable; and, if a jury decided that punitive damages were warranted, such an award would indicate that the defendants' actions constituted a willful violation of the law, suggesting that they had acted outside the scope of their employment. Such a result could cast doubt upon whether New York State should have been liable for the award of compensatory damages (since the state in the Court of Claims is liable only if its employees act within the scope of their employment), thereby calling into question the correctness of the Court of Claims' decision. *Id.* at 87.

Finally, the court in *Ramsey* noted that the state had already incurred the costs associated with the plaintiff's Court of Claims action, in addition to the payment of the compensatory damages, and stated that "[r]equiring further expenditure of taxpayers' money to support relitigation of claims simply to recover punitive damages, an uncertain enterprise even in a strong case, which could have been recovered in the same action along with compensatory damages had Ramsey first pursued his § 1983 action," violates New York's rule against "claim splitting," pursuant to which a final judgment rendered in an action which extinguishes the plaintiff's claim also extinguishes all rights of the plaintiff to further remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. *Id.* at 86–87. *See, e.g., Charles E.S. McLeod, Inc. v. R.B. Hamilton Moving and Storage*, 89 A.D.2d 863, 864, 453 N.Y.S.2d 251 (2d Dep't 1982).

■ I agree with the reasoning of *Ramsey,* and apply the same rule here. It was

plaintiff who chose to litigate these claims first in the Court of Claims. Having elected that remedy, having had a full and fair opportunity to litigate his claim in that court, and having been fully compensated for his injury, plaintiff should not be allowed to force the state to further defend against essentially the same claims in this Court simply so that plaintiff can attempt to pursue a claim for punitive damages. Accordingly, plaintiff's claims arising directly out of the incidents on July 10 and 11, 1996 are barred by res judicata.[3]

Defendant Robert Kauffman, a sergeant at Attica, was not named in plaintiff's claim filed with the Court of Claims.[4] In the instant action, plaintiff alleges that Sgt. Kauffman was standing nearby when plaintiff was assaulted in an elevator by two corrections officers on July 10, 1996. Plaintiff alleges that Kauffman was standing at the front of the elevator with his back to plaintiff and the officers when the assault occurred, and that when plaintiff cried out, Kauffman did not intervene, but only said, "Stop struggling, why [are] you struggling?," or words to that effect. Transcript, Pt. 1 ("T–1"), Defendant's Motion (Docket # 77) Ex. A, at 29.

Although Kauffman was not mentioned by name in the Court of Claims complaint

(in which, by law, only the state could be named as a defendant, see N.Y.Ct.Cl.Act, § 9(2)), he did testify at the trial before Judge Nemoyer concerning his recollection of what happened in the elevator with plaintiff on July 10. Kauffman was also cross-examined by plaintiff during the trial. Gelormini Aff.Ex. E. Thus, plaintiff had a full and fair opportunity to litigate his claims concerning Kauffman's alleged involvement in these events, and I find that plaintiff's claims against him are barred by res judicata as well.

## II. Alleged Taking of Plaintiff's Pain Relief Medicine

Plaintiff alleges that on March 13, 1997, when he was leaving the correctional facility to travel to a court appearance, he handed defendant Baker a bag containing some legal papers as well as some pain medication[5] that plaintiff had been given for pain from injuries that he sustained during a February 25, 1997 incident. Apparently plaintiff did this because both he and his possessions had to be searched before plaintiff went to court.

Plaintiff alleges that after he was searched and when he was about to leave for court, his legal work was returned to him, but not the pain medicine. Plaintiff

---

**3.** Although plaintiff does not raise this argument, I also note that the fact that plaintiff could not sue the individual defendants in the Court of Claims likewise does not prevent his claims in the instant action from being barred. "[C]ourts have found in similar circumstances that a later suit asserting § 1983 claims against individuals are nevertheless barred by a previous determination in the Court of Claims based on either res judicata or collateral estoppel." *Ramsey*, 19 F.Supp.2d at 84 (collecting cases).

**4.** Defendant Nurse Brigette Schmitz's name does not appear in plaintiff's state court claim, but it appears that she is the person to whom plaintiff was referring in that claim when he alleged certain actions by "R.N.B.

Schmidt." Since plaintiff's claims against Schmitz in this action are essentially the same as those that he raised against "Schmidt" in the Court of Claims action, his claims against Schmitz are barred by res judicata. In any event, his claims against Schmitz would be subject to dismissal on the merits, since neither plaintiff's allegations nor the evidence would support a finding that Nurse Schmitz deliberately ignored plaintiff's serious medical needs.

**5.** Plaintiff did not remember at his deposition precisely what type of medication this was. His medical records indicate that he was taking Motrin (*i.e.*, ibuprofen) at around this time. *See* Steven Laskowski Affirmation (Docket # 94), Ex. A.

alleges that Baker discarded the medicine or otherwise prevented it from being returned to plaintiff.

The precise nature of this claim is unclear. Plaintiff may be alleging that he was deprived of property without due process of law in violation of his rights under the Fourteenth Amendment. If that is his claim, however, it must fail.

■ "[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). "New York in fact affords an adequate post-deprivation remedy in the form of, *inter alia,* a Court of Claims action." *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001). Accordingly, plaintiff's allegations fail to state a claim under this theory.

■ Plaintiff may also be alleging that the deprivation of his pain relievers amounted to cruel and unusual punishment in violation of the Eighth Amendment. In order to make out such a claim, plaintiff must prove "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The standard of deliberate indifference includes both subjective and objective components. "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations omitted), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Ramos v. O'Connell,* 28 F.Supp.2d 796, 802 (W.D.N.Y.1998). Second, the defendant "must act with a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. An official acts with the requisite deliberate

indifference when that official "knows of and disregards an excessive risk to [a detainee's] health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970.

■ The Second Circuit has stated that a medical need is "serious" for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Hathaway,* 37 F.3d at 66). Among the relevant factors are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds, WMX Tech., Inc. v. Miller,* 104 F.3d 1133 (1997)).

■ I find that this claim fails to meet either the objective or subjective prongs of the test. First, though I recognize that a denial of pain relief medication could, under some circumstances, be considered "sufficiently serious," *see, e.g., Ralston v. McGovern,* 167 F.3d 1160, 1161–62 (7th Cir.1999) (defendant's "gratuitous cruelty" in refusing to let plaintiff have medication that had been prescribed to control pain caused by radiation therapy for cancer violated Eighth Amendment), this is not such a case.

Plaintiff testified at his deposition that at the time of this incident, his "foot was aching," and that he "thought [his] rib was broken because [he] was still aching any time [he] breathe[d]." [6] T–1 at 121. He

---

**6.** Plaintiff makes no claim, and there is no evidence, that his rib actually was broken.

stated that the medication "[r]elieve[d] some of [the pain]. It relieve[d] the pain. I rather take it than be without it." *Id.* at 123. Plaintiff agreed that the medication made the "pain a little bit less than it [was] without." *Id.* He stated that even with the medication, the pain "ain't go away." *Id.* at 124. Plaintiff also testified that he was without pain medication for about three days after he gave it to Baker.[7]

Viewing this evidence in the light most favorable to plaintiff, a factfinder could conclude that plaintiff was suffering from some, but certainly not debilitating or intense pain, and that his medication reduced, but did not eliminate, that pain. Thus, for about three days, plaintiff's pain was somewhat worse than it would have been if he had had his medication.

■ "An assertion of pain sensation alone, unaccompanied by any large medical complications, does not amount to a serious medical need under the Eighth Amendment." *Inciarte v. Spears*, No. 97 Civ. 3155, 1998 U.S.Dist. LEXIS 5731, *11 (S.D.N.Y. Apr. 20, 1998). *See, e.g., Carr v. Harry*, No. 01 C 5203, 2001 WL 1654714 (N.D.Ill.Dec. 20, 2001) (plaintiff's deprivation of medication for arthritis pain for forty hours "did not amount to wanton infliction of pain in violation of the Eighth Amendment"); *Frisby v. Dzuba*, No. 94 C 6319, 1996 WL 650526, *2 (N.D.Ill. Nov. 7, 1996) ("Additional pain alone is not enough to prove a serious medical need"); *Sloan v. Durkin*, No. 94 C 5876, 1996 WL 284973, *4 (N.D.Ill. May 24, 1996) ("Pain alone is not proof of a serious medical need").; *Bryan v. Administrative of F.C.I. Otisville*, 897 F.Supp. 134, 137 (S.D.N.Y.1995) (plaintiff's assertion that he failed to receive medication for three days, that his complaints of insomnia, fever and infection

during that time were ignored, and that as a result of this deprivation he suffered fever and developed a mouth infection, did not meet the stringent "deliberate indifference" standard adopted in *Estelle* ); *Sykes v. City of New York*, No. 93 Civ. 6577, 1994 WL 570824, *2 (S.D.N.Y. Oct. 17, 1994) ("It is doubtful that the alleged deprivation of pain and sleeping medication would by itself state a sufficiently serious condition for Eighth Amendment purposes"); *see also Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996) (alleged deprivation must be "sufficiently serious" to create a "condition of urgency" that may "produce death, degeneration, or extreme pain" in order to state Eighth Amendment claim).

Moreover, "infliction of pain, alone, does not rise to constitutional significance unless the misconduct also satisfies the 'wantonness' component of the standard. At a minimum, plaintiff must demonstrate that defendant[ ] acted with deliberate indifference to plaintiff's well being." *Smith v. Pugh*, No. 88–3083, 1992 WL 105048, *2 (D.Kan. Apr. 30, 1992) (citing *Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). I find that plaintiff has failed as a matter of law to meet this second prong of the test as well.

All that plaintiff has alleged is that he gave Baker a bag containing some legal papers and some medication, and that the latter was not returned to him. Plaintiff testified at his deposition that he could not "really say [that Baker] said [that plaintiff was] not getting [the medication] back or nothing," only that plaintiff "gave it to [Baker] and [Baker] ain't never returned it." T–1 at 129. Plaintiff had no evidence of what Baker did with the medication or why it was not returned to him, nor did he

---

7. Plaintiff was not certain of the exact length of time. He stated that he gave Baker the medication and his legal papers when he went from Attica to Auburn, where he stayed for three days, after which he was taken to Great Meadow, where he was given additional pain medicine. T–1 at 121–25.

ever ask Baker about it; *see* T–1 at 121 ("I didn't ask [Baker] about it, no, no").

Even viewing this evidence in the light most favorable to plaintiff, I find that no genuine issue of material fact exists concerning this claim. There is simply no evidence that Baker knew of and disregarded an excessive risk to plaintiff's health or safety, *see Farmer*, 511 U.S. at 837, 114 S.Ct. 1970, that he caused the "wanton infliction of pain" upon plaintiff, *Estelle*, 429 U.S. at 104, 97 S.Ct. 285, or, for that matter, that it even *was* Baker who caused plaintiff's medicine not to be returned to him.

### III. Alleged Theft of Plaintiff's Documents

Plaintiff alleges that on April 27, 1997, when he returned from a trip to court, plaintiff was placed in a different cell from the one he had been in before. He alleges that after he was placed in the new cell, defendant Bennis returned to plaintiff some personal property that plaintiff had left behind in the other cell, but that certain legal documents, which plaintiff had intended to use in his Court of Claims proceeding, were missing.

The complaint does not allege that anyone in particular was responsible for the documents' disappearance. At his deposition, plaintiff testified, "I'm going to say Fial and Bennis took it because they searched before giving it to me and they searched out of my presence." T–1 at 132. He added, "Only evidence I got [is] that they searched it and it was missing." T–1 at 133. Plaintiff stated that he knew that Bennis and Fial searched his property because "they told me they searched it." T–1 at 133. Plaintiff also alleges that the

missing documents concerned plaintiff's claims against Bennis and Fial. T–1 at 133.

Plaintiff testified that he was able to get copies of these documents from Assistant Attorney General James Gelormini. T–1 at 133. It is not clear when plaintiff got those copies, but he testified, "I couldn't really use them during the Court of Claim thing." T–1 at 133. He also testified that because he lacked these documents, he "couldn't make exhibits [for his] appeal of the [disciplinary] hearing because [he] had . . . three or four hearings on the same thing and they kept overturning them." T–1 at 135.[8]

Plaintiff states that the legal basis for this claim is "due process violation" and "access to the courts." To the extent that plaintiff alleges that he was deprived of his property without due process of law, his claim must be dismissed because, as explained above, New York provides an adequate post-deprivation remedy for such an injury. *Hudson*, 468 U.S. at 533, 104 S.Ct. 3194; *Jackson*, 256 F.3d at 96.

With respect to plaintiff's claim that these actions violated his right of access to the courts, it is well established that prison inmates have a constitutional right of access to the courts, *Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), and deprivation of legal papers may constitute a denial of that right. *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir.1988) (confiscation of prisoner's legal papers violates constitutional right of access to the courts); *Morello v. James*, 810 F.2d 344, 347 (2d Cir.1987); *Hiney v. Wilson*, 520 F.2d 589, 591 (2d Cir.1975). Where the prisoner alleges a single or isolated incident of denial of access, he

---

8. Though the record is not entirely clear on this point, it appears that plaintiff claims that he only temporarily got access to copies of some of these documents from Gelormini.

He testified that he "got copies from . . . Mr. Gelormini, I think they was exhibits and they was returned to him because they didn't give them to me or something." T–1 at 134.

must demonstrate some actual injury in a pending lawsuit. *Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y. 1994).

The evidence in the case at bar, viewed in the light most favorable to plaintiff, the nonmoving party, indicates that Bennis and Fial told plaintiff that they had searched his property, and that when it was returned to him by Bennis, plaintiff's legal papers, which related to his claims against those two defendants, were missing. That is, perhaps, some circumstantial evidence that Bennis and Fial took plaintiff's legal papers, though whether it is enough to support a finding to that effect is debatable.

█ Even assuming that this evidence does give rise to an issue of fact in that regard, however, there is no evidence that the loss of these documents materially prejudiced plaintiff in some legal action. Plaintiff states in the complaint that he "intend[ed] to use [these documents] in [his] Court of Claims lawsuit," which was still pending at the time that plaintiff filed the complaint in this action. Plaintiff *prevailed* in the Court of Claims, however, and was awarded over $3000 in damages. Given that outcome, there is no evidentiary support for plaintiff's conclusory allegation that the "missing documents hindered [his] Court of Claims action...." Plaintiff's Memorandum of Law at 14.

Plaintiff's assertion that the absence of these documents also hindered both his ability to defend himself in disciplinary proceedings arising out of his altercation with some of the defendants on July 11, 1996, as well as his prosecution of the instant lawsuit, are equally conclusory and lacking in evidentiary support. Plaintiff has not stated specifically what these documents related to, what facts they contained, how he intended to use them in any of his legal proceedings, or how and why he was prejudiced by their loss. It is also clear that at some point he obtained copies of the missing documents. Accordingly, defendants are entitled to summary judgment on this claim. *See Smith v. O'Connor,* 901 F.Supp. 644, 649 (S.D.N.Y.1995) ("Assuming ... that defendants did destroy plaintiff's legal papers, and presuming ... that such destruction was deliberate and malicious, plaintiff offers no facts to explain how the destruction of his legal papers prejudiced his ability to seek redress from the judicial system").

## IV. Drugged Food

█ Plaintiff alleges that six of the defendants, all corrections officers, drugged his food on various occasions. Specifically, he alleges that the following defendants gave him drugged food on the following dates: Bennis from June 23–28, 1998; Fial from May 19–20, 1998; Kulik from December 8–27, 1997; Baker in October and November 1996, and from December 12–13, 1997; Barker on July 17, 1998 and July 23, 1998; and Freese from November 5–7, 1997.[9] These events all occurred while plaintiff was confined in the Special Housing Unit ("SHU") at Attica. At mealtimes, these defendants would bring plaintiff and the other inmates in SHU their food on individual trays.

When asked at his deposition what evidence he had to support these allegations, plaintiff replied, "they gave me the tray with food in it and after eating the food, I felt other than I felt before I ate it." T–1 at 153. Similarly, when asked how he knew that it was these defendants who

9. At his deposition, plaintiff stated that he believed that the allegation against Freese should have stated that it occurred in 1996, not 1997. T–1 at 160.

drugged his food, plaintiff answered, "They gave me the tray with the food on it." T–1 at 154.

Plaintiff stated that the food "taste[d] ... mediciney sometimes," but also that "[y]ou wouldn't really taste it because the sugar disguise—camouflaged it or something." T–1 at 155. He said that within a short time after he had eaten his food on these occasions, he "felt dizzy" and "lightheaded ... drugged up." T–1 at 156. He stated that he would have difficulty concentrating, and that sometimes he would "go to sleep." T–1 at 156. On one occasion, he said, he "stood up and almost fell" when defendant Baker came to retrieve plaintiff's tray after he had finished eating. T–1 at 159.

Plaintiff also stated that the only person from the medical staff at Attica that he spoke to about this was a social worker or mental health counselor named Bruce. T–1 at 157, 170. He stated that although nurses came by regularly, he never told any of them that his food was being drugged. T–1 at 170. Plaintiff also testified that he never told any of the physicians on the staff about this matter. T–1 at 170.

Plaintiff contends that other inmates in SHU also complained about their food being drugged. He has submitted copies of grievances filed by himself and some of the other inmates about these complaints.[10] Plaintiff's Affidavit (Docket # 100) Ex. F. Plaintiff has also submitted a copy of excerpts from his date books containing what he states are contemporaneous notes in which he recorded the days on which he believed that he had been given adulterated food. Plaintiff's Aff.Ex. E.

This evidence is simply too thin to give rise to an issue of fact about whether these defendants deliberately tampered with plaintiff's food. At most, the evidence indicates that there may have been something in plaintiff's food that caused him to feel "drugged up," but there is no evidence of what it was about the food that caused him to feel that way. To conclude that the food had been intentionally laced with drugs would be speculative at best. By plaintiffs own admission, he did not inform any physicians or nurses about this matter, and there is no medical evidence in the record indicating whether plaintiff did have any drugs in his system on these occasions, or what the cause of his symptoms was. *See Cooper v. Bowles,* 1997 WL 361879, *2 (N.D.Tex. June 20, 1997) ("Although Cooper identifies maladies such as dizziness, absentmindedness, forgetfulness, chest pains, head pains, and stomach pains resulting from food tampering, he has failed to state the nature of any tampering or to provide any factual support to demonstrate that food tampering actually occurred").

Moreover, even assuming that the food was contaminated by someone, it would again be speculative to conclude that these defendants were the culprits simply because they delivered plaintiff's food to him. Presumably they did not actually prepare the food (plaintiff states at page 16 of his brief that "after [the food] come[s] up from the messhall," the corrections officers in SHU "put the food in the trays and deliver it"), and so other persons must have come into contact with the food before it was delivered to plaintiff. There is simply no way that a factfinder could reasonably con-

---

10. These grievances were denied following an investigation by a Sgt. Gavigan, who interviewed the grievants. In his decision denying the grievances, the Inmate Grievance Program superintendent noted that "[o]ver 100 meals are prepared daily per meal and only three inmates are complaining about their food being drugged. All meals are prepared with video camera coverage and are delivered promptly thereafter." He concluded that the grievances were unsubstantiated. Plaintiff's Aff.Ex. F.

clude, upon this evidence, both that plaintiff's food had been drugged, and that these defendants were the culprits. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (to survive well-founded motion for summary judgment, non-moving party must come forward with "concrete evidence from which a reasonable juror could return a verdict in his favor").

## V. Claims Against Dr. Young

Plaintiff alleges that defendant "Dentist J.E. Young in May of 1997 conspired with Sgt. R.C. Kauffman to deliberately infect [plaintiff] with sarcoidosis [11] by injecting [him] with an infected needle while he was implementing [sic] novocain in [plaintiff's] gums to allegedly fill-in a cavity that was not a cavity [sic]." Complaint, heading S.

There is virtually no evidence to support this claim. First, plaintiff was not treated by Dr. Young in May 1997, but in October 1996. Transcript, Part 2 ("T–2") at 52. Aside from that, virtually the only evidence that plaintiff has—besides the fact that at some point after this visit to Dr. Young, plaintiff was diagnosed with sarcoidosis—is that Dr. Young "was acting very strange" and arguing with Sgt. Kauffman, who was standing nearby. Plaintiff testified that he heard Dr. Young say to Sgt. Kauffman, "something like he don't want to do this. Why should I do this. . . ." T–2 at 56. At one point Dr. Young left the room for a few minutes. After he re-

turned, he administered novocaine and filled what he said was a cavity in plaintiff's tooth. Plaintiff testified that he does not believe that be actually had a cavity, because on two prior visits to a dentist, "the only cavity they was concerned with" was a filling elsewhere in plaintiff's mouth. T–2 at 59.

As is plaintiff's claim about his food being tampered with, this claim is founded upon little more than speculation. Plaintiff states that he was diagnosed with sarcoidosis on August 27, 1997, ten months after this visit to Dr. Young. He admitted at his deposition that he had "learned that it's [*i.e.*, the cause of sarcoidosis] unknown . . . ." T–2 at 58. There is simply no evidence in the record to connect Dr. Young's treatment of plaintiff with his diagnosis of sarcoidosis ten months later, and this claim must therefore be dismissed.

## VI. Claims Against Nurse Frisby

The complaint alleges that "Barbara Frisby the nurse in SHU is tempering [sic] with me getting medical care and impeding the care I am suppose [sic] to get via the outside hospital. This nurse is working with the C.O.'s in SHU to deny me proper medical attention." Complaint, heading Q.

Plaintiff now states, however, that he "may have made a mistake" concerning the name of this nurse and that he "would like to dismiss the lawsuit against" Frisby and "would like nurse Barbara Higley to replace her as a defendant." Plaintiff's Aff. ¶ 10; Plaintiff's Rule 56 Statement ¶ 12.[12]

---

**11.** Sarcoidosis is a disease, currently of unknown origin, due to inflammation that can appear in almost any body organ, but most often starts in the lungs or lymph nodes. As sarcoidosis progresses, small lumps, or granulomas, appear in the affected tissues. In the majority of cases, these granulomas clear up, either with or without treatment, but in the few cases where the granulomas do not heal and disappear, the tissues tend to remain inflamed and become scarred. National Institutes of Health, "Sarcoidosis," NIH Publi-

cation No. 95–3093, *available at* ht tp://www.nhlbi.nih.gov/health/public/lung/other/sarcoidosis/.

**12.** It appears that there is both a Nurse Frisby and a Nurse Higley. Defendants have submitted an affidavit (Docket # 84) from Frisby, who states that at all relevant times she was the Nurse Administrator at Attica. She states that she never saw or treated plaintiff while he was in SHU. Plaintiff's medical records also indicate that he was seen by a Nurse B.

At his deposition, plaintiff stated that the basis for this claim was that "[o]n several different occasions" a Dr. Congdon "was supposed to come check on" plaintiff for his sarcoidosis, but "[h]e was unable to." T–2 at 12. He stated that Higley [13] was "the administering nurse" and that he "asked her about it [*i.e.*, Dr. Congdon] and she give me the run around and different excuses." T–2 at 12.

Plaintiff did eventually see Dr. Congdon. Plaintiff testified, "[h]e told me that he was here several times and he ain't get to see me." When asked if Dr. Congdon explained why he had not been able to see plaintiff, plaintiff replied that Congon "didn't really get into it," except that for "some reason, he didn't get to see" plaintiff. T–2 at 12.

Plaintiff also alleges that Higley somehow caused certain treatment recommended by Dr. Congdon to be delayed, but he again offered little basis for this allegation other than that Higley "would give [plaintiff] the run around. . . ." T–2 at 24. Plaintiff also stated that Higley "was friendly with" a corrections officer that plaintiff "had problems [with] before." T–2 at 25. Plaintiff testified that he personally never had a problem with Nurse Higley. T–2 at 26.

■■■ These allegations simply do not state a claim against Higley. There is no evidence that she prevented Dr. Congdon from seeing plaintiff, or that anything she did or did not do caused any delay in plaintiff's treatment or adversely affected his health. These allegations fall far short of what is needed to establish a constitutional violation. Accordingly, defendants' motion for summary judgment on this claim is granted, and plaintiff's request to add Higley as a defendant on this claim is denied as futile.

## VII. Claims Against Dr. Laskowski

■■■ Plaintiff alleges that Dr. Steven Laskowski, a physician at Attica, denied plaintiff "medical care that was recommended by [Dr. Congdon] about a lump on the left side of [plaintiff's] neck." Complaint, heading R; T–2 at 37. Plaintiff alleges that when he asked Dr. Laskowski about "the tests and procedures to be perform[ed] he act indifferent and start lying about [plaintiff's] ailment." Complaint, heading R.

An examination of the record, however, particularly the transcript of plaintiff's deposition, reveals that plaintiff's claim against Dr. Laskowski is based on little more than his dissatisfaction with the care that plaintiff received from him. Apparently in plaintiff's view Dr. Laskowski minimized the seriousness of plaintiff's illness, and should have done more to treat plaintiff's condition. Plaintiff did not know why Dr. Laskowski would have deliberately mistreated plaintiff, stating, "I just think he's just indifferent to my medical needs the way he respond to them." T–2 at 48. He named Laskowski as a defendant because Laskowski "was the main doctor coming up to SHU" and was "supposed to be like on it because he was the doctor coming up there." T–2 at 48.

In addition, Dr. Laskowski has described his treatment of plaintiff in his affidavit (Docket # 94), and that treatment is also documented in plaintiff's medical record, which is attached to Dr. Laskowski's affidavit. That evidence shows that Dr. Laskowski saw plaintiff on several occasions, and that plaintiff was also treated

---

Higley at times. Since this claim relates to plaintiff's interactions with this nurse, it appears that Higley is the person in question.

**13.** At his deposition, this nurse was still referred to as "Frisby," but I will assume that plaintiff's testimony relates to Higley.

by various specialists as his condition dictated.

This evidence shows neither a deprivation "sufficiently serious" to create a "condition of urgency" that might "produce death, degeneration, or extreme pain," *Hathaway*, 99 F.3d at 553, nor a "sufficiently culpable state of mind" on the part of Dr. Laskowski. *Hemmings v. Gorczyk* 134 F.3d 104, 108 (2d Cir.1998). Rather, all they show is plaintiff's subjective dissatisfaction with Dr. Laskowski's treatment of him.

 It is well-established, however, that mere disagreement over the proper treatment does not create a constitutional claim, and that negligence alone, even if it constitutes medical malpractice, does not give rise to an Eighth Amendment violation. *Parkinson v. Goord*, 116 F.Supp.2d 390, 396 (W.D.N.Y.2000); *accord Rosales v. Coughlin*, 10 F.Supp.2d 261, 264 (W.D.N.Y.1998). Only if the malpractice rises to the level of "criminal recklessness" will the defendant be found liable. *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir.1998). Plaintiff's allegations do not give rise to any issue of fact in this regard.

## VIII. Claims Against Goord and Kelly

Plaintiff has alleged that defendant Glenn Goord, the Commissioner of DOCS, and defendant Walter Kelly, who was the Superintendent of Attica at all times relevant to this action, were aware of plaintiff's various problems that form the subject of his claims against the other defendants, and that they did nothing to correct those problems.[14]

 The gist of plaintiff's claims against Goord is that "[f]or more than two years [plaintiff] complained to Commis-sioner Goord via the mail and nothing changed. The defendant forward[ed] all [of plaintiff's] complaints to his subordinates," who took no effective action. Plaintiff's Aff. ¶ 11.

Plaintiff's claims against Kelly are similar, although he also asserts a claim against Kelly relating to the spoliation of evidence. Plaintiff wrote to Kelly on July 16, 1996 to complain that he had been assaulted by corrections officers on July 10 and 11. In the letter, plaintiff stated, "I would like both tapes preserved for further litigation," referring to videotapes of the incidents. Plaintiff's Aff.Ex. N.

The videotapes were not preserved, however. On October 2, 1998, the Appellate Division ruled that New York State would be precluded from offering any evidence at the trial of plaintiff's Court of Claims action in opposition to plaintiff's proof with respect to the incidents that were the subject of the destroyed videotapes. *Livingston v. State*, 254 A.D.2d 694, 695, 677 N.Y.S.2d 856 (4th Dep't 1998). As stated, plaintiff prevailed in that action. He alleges, however, that the destruction of these tapes hampered his ability to defend himself in the disciplinary proceedings against him arising out of these incidents, which ultimately led to plaintiff spending a year in SHU.

 These allegations are insufficient to support a claim against Goord or Kelly, as they fail to show that they were personally involved in the alleged violations of plaintiff's rights. "It is well settled in this Circuit that personal involvement of defendants in the alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Johnson v. Newburgh Enlarged*

---

14. Plaintiff's claims against Goord and Kelly relating to their failure to protect him from the alleged assaults in July 1996 were dismissed in a Memorandum Order on August 31, 1999. Plaintiff also alleges, however, that they failed to do anything about the tampering with his food, medical problems, etc.

*School Dist.*, 239 F.3d 246, 254 (2d Cir. 2001) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995)); *see also Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir.2001). The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Colon*, 58 F.3d at 873; *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.1986).

■■■ Even assuming that Goord and Kelly received plaintiff's letters, yet took no action, plaintiff has still not established their personal involvement in the alleged constitutional deprivations. "Generally, the allegation that a supervisory official ignored a prisoner's letter protesting unconstitutional conduct is not itself sufficient to allege the personal involvement of the official so as to create liability under § 1983." *Pritchett v. Artuz*, No. 99 Civ. 3957, 2000 WL 4157, *6 (S.D.N.Y. Jan. 3, 2000) (quoting *Gayle v. Lucas*, No. 97 Civ. 883, 1998 WL 148416, *4 (S.D.N.Y. Mar. 30, 1998)); *see Richardson v. Coughlin*, 101 F.Supp.2d 127 (W.D.N.Y.2000) ("Even assuming that [prison superintendent] received plaintiff's letter, yet took no action, plaintiff has still not established [superintendent's] personal involvement in the alleged constitutional deprivation"); *Thomas v. Coombe*, No. 95 Civ. 10342, 1998 WL 391143, *6 (S.D.N.Y. July 13, 1998) (even assuming that plaintiff wrote letters com-

plaining of a denial of medical care to supervisory defendants, "the fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement"); *Woods v. Goord*, No. 97 Civ. 5143, 1998 WL 740782, *6 (S.D.N.Y. Oct. 23, 1998) (receiving letters or complaints does not automatically make a supervisor liable for the denial of medical care).

■■■ It is also clear that a supervisory official's forwarding of inmate's letters to his subordinates will not suffice to establish the official's personal involvement in the alleged constitutional deprivation. The Second Circuit addressed a similar situation in *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir.1997):

> Sealey wrote two letters to Coughlin [a former DOCS commissioner]. Coughlin referred the first letter, Sealey's appeal from [his] administrative segregation hearing, to defendant Selsky [the acting director of special housing/inmate discipline] for decision. Sealey's second letter was a status inquiry to which Coughlin responded by informing Sealey that Selsky had rendered a decision. Sealey's letters and Coughlin's response do not demonstrate the requisite personal involvement on Coughlin's part, and we affirm the dismissal of Sealey's claims against Coughlin.

Following *Sealey*, this Court has recognized that where a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action. *See Garvin v. Goord*, 212 F.Supp.2d 123, 126 (W.D.N.Y. 2002); *Edmonson v. Coughlin*, 21 F.Supp.2d 242, 255 (W.D.N.Y.1998). Because plaintiff has failed to present evidence of Goord's and Kelly's personal involvement in the alleged violations of

plaintiff's rights, his claims against these defendants are dismissed.

## CONCLUSION

Defendant's motion for partial summary judgment (Docket # 77) is granted, and all of plaintiff's claims are dismissed, except for his claims against defendants Piskor, Sette, Mackiewicz, Dunshie, Wendle, and Hoinski relating to the alleged assault on plaintiff on February 25, 1997..

IT IS SO ORDERED.